**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA**
**CIVIL DIVISION**

| | | |
|---|---|---|
| **BARBARA WILLIAMS** | : | |
| **828 Barnaby Street, S.E.** | : | |
| **Washington, D.C. 20032** | : | **Civil Action No:** |
| | : | |
| **Plaintiff** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **MURPHY BROTHERS,** | : | |
| **INCORPORATED** | : | |
| **3251 Washington Boulevard** | : | |
| **Arlington, VA 22201** | : | |
| | : | |
| **Serve:** | : | |
| **Thomas O. Lawson** | : | |
| **1805 Main Street, Suite 200** | : | |
| **Fairfax, VA 22030** | : | |
| | : | |
| **and** | : | |
| | : | |
| **TRANSPORTATION INC.** | : | |
| **d.b.a.  RED TOP CAB COMPANY** | : | |
| **OF ARLINGTON** | : | |
| **3251 Washington Boulevard** | : | |
| **Arlington, VA 22201** | : | |
| | : | |
| **Serve:** | : | |
| **Thomas O. Lawson** | : | |
| **1805 Main Street, Suite 200** | : | |
| **Fairfax, VA 22030** | : | |
| | : | |
| **Defendants** | : | |

===============================

**COMPLAINT**

COMES NOW Plaintiff BARBARA WILLIAMS, by and through undersigned counsel, Billy L. Ponds, of The Ponds Law Firm, who respectfully submits this Complaint against Defendants Murphy Brothers, Incorporated and Transportation Inc. In support of her claims, Plaintiff Barbara Williams states as follows:

## JURISDICTION AND VENUE

1.     This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. §1331, 29 U.S.C. § 2617, and the Civil Rights Act of 1964 (Title VII, 42 U.S.C. §2000e-5). The amount of controversy herein, excluding interest and costs, exceeds the jurisdictional limit of this Court.

2.     Plaintiff Barbara Williams brings this action to redress the Defendants' deprivation of rights secured to plaintiff pursuant to Title VII of the Civil Rights Act of 1964 (42 U.S.C. §2000(e)), The Americans with Disabilities Act (42 U.S.C. §12112), and The Family and Medical Leave Act ("FMLA") (29 U.S.C. §2617).

3.     Plaintiff Barbara Williams is filing her Complaint with this court within ninety (90) days of receipt of the U.S. Equal Opportunity Employment Commission Dismissal and Notice of Rights letter dated and issued on October 11, 2017.

4.     Plaintiff Barbara Williams is a resident of The District of Columbia.

5.     Defendant Murphy Brothers, Incorporated is a corporation that was incorporated under the laws of Virginia and has its principal place of business in Virginia.

6.     Defendant Transportation Inc. is a corporation that was incorporated under the laws of Virginia and has its principal place of business in Virginia.

7.     At all relevant times herein, Defendant Murphy Brothers, Incorporated continuously and systematically did business in The District of Columbia.

8.     At all relevant times herein, Defendant Murphy Brothers, Incorporated had employees that are residents of The District of Columbia.

9.     At all relevant times herein, Defendant Transportation Inc. continuously and systematically did business in The District of Columbia.

10.     At all relevant times herein, Defendant Transportation Inc. had employees that are residents of The District of Columbia.

11.     Plaintiff submits that this Court has jurisdiction over all parties and claims for relief cited herein.

12.     Venue is proper in this Court as set forth herein.

## PARTIES

13.     Barbara Williams ("Williams") is an African-American female over the age of eighteen who at all relevant times herein served as a Reservationist employed by the Defendants.

14.     Murphy Brothers, Incorporated ("Murphy Brothers") is a corporation with the authority to sue and be sued. At all relevant times herein, Murphy Brothers has had fifteen or more employees for each working day in each of twenty or more calendar weeks.

15.     Murphy Brothers is the parent company of Transportation Inc.

16.     Transportation Inc., who does business as Red Top Cab Company of Arlington ("Red Top"), is a corporation with the authority to sue and be sued. At all relevant times herein, Red Top has had fifteen or more employees for each working day in each of twenty or more calendar weeks.

## FACTS

17.     Williams commenced her full-time employment at Red Top as a Reservationist on April 21, 2015.

18.     At all relevant times herein, Williams was paid at an hourly rate for her work.

19.     Williams worked as a Reservationist at Red Top until her employment was terminated by the Defendants on September 14, 2016.

20.     Upon information and belief, at all relevant times herein, Red Top would pick up customers in Washington, D.C.

21.     Upon information and belief, at all relevant times herein, Red Top would drop off customers in Washington, D.C.

22.     Upon information and belief, at all relevant times herein, Red Top Taxi Cabs had logos that advertised Red Top.

23.     Phil Hodson ("Hodson") was the Communications Director at Red Top and served as William's direct supervisor during her employment at Red Top.

24.     Olivia Payton ("Payton") also served as Williams' supervisor during her employment at Red Top.

25.     Hodson's direct supervisor, Mr. Nickleson, is an owner of Red Top.

26.     Williams' shift at Red Top was 6:00am to 6:00pm, Sunday through Wednesday, from May 2015 until July 2016.

27.     Williams schedule did not vary week to week for the period of May 2015 until July 2016.

28.     In December 2015, Williams became pregnant.

29.     In December 2015, Williams informed her supervisors at Red Top that she was pregnant.

30.     In February 2016, Williams experienced complications with her pregnancy and was hospitalized from February 23 to February 26, 2016.

31.     Williams had a miscarriage at or about the beginning of March 2016.

32.     In June 2016, Williams again became pregnant.

33.     At or about June 2016, Williams informed her supervisors at Red Top that she had again become pregnant.

34.     In July 2016, Williams again experienced complications with her pregnancy and was diagnosed with a kidney infection.

35.     Williams' previously had three (3) Caesarean section deliveries.

36.    The kidney infection, Williams' age, Williams' prior history of Caesarean delivery and complications that Williams was experiencing classified her pregnancy as high risk.

37.    Williams informed her supervisors at Red Top that she would frequently need to use the bathroom due to her pregnancy.

38.    In July 2016, Hodson informed Williams that he knew she was pregnant, but that she was "using the bathroom too frequently."

39.    The next pay period after Williams' July 2016 conversation with Hodson regarding Williams' bathroom usage, Williams' pay was decreased.

40.    Williams' July 29, 2016, paycheck was four (4) hours less than her usual paychecks.

41.    Williams' July 29, 2016, paycheck did not accurately reflect the hours that she had worked.

42.    Williams paycheck was decreased multiple times without explanation subsequent to her July 2016 conversation with Hodson.

43.    Upon information and belief, the motivating factor in decreasing Williams' paycheck was Williams pregnancy and race.

44.    Upon information and belief, all non-pregnant employees used the bathroom as frequently, or more frequently, then Williams, but were not penalized and did not have their pay decreased.

45.    At or about July 2016, Williams inquired with Payton about taking leave pursuant to FMLA.

46.    Williams inquired about FMLA leave to see what rights she had to take leave for medical issues, including but not limited to, those related to her pregnancy and kidney infection.

47.    Williams was not previously aware of her rights pursuant to FMLA, but inquired with Payton about FMLA leave after seeing postings around the office referencing FMLA.

48.     Williams inquired both about taking FMLA leave during her pregnancy and subsequent to her delivery.

49.     Williams' delivery date was February 2017.

50.     The day after Williams inquired with Payton about FMLA leave, all FMLA postings referencing FMLA were removed.

51.     Upon information and belief, Red Top intentionally removed the FMLA postings in an attempt to discourage and prevent Williams from taking FMLA leave.

52.     The day after Williams inquired with Payton about FMLA leave, Williams was contacted by a Human Resources Division representative of Red Top.

53.     When Williams inquired about the process to apply for and receive FMLA leave, the aforementioned Human Resources Division representative informed Williams that she was not currently eligible for FMLA leave, would not be eligible after her delivery date and therefore would not be able to take any leave pursuant to FMLA.

54.     Upon information and belief, the aforementioned Human Resources Division representative knew that Williams was eligible for FMLA leave, but intentionally discouraged Williams from further pursuing FMLA leave.

55.     At the time Williams was an employee at Red Top, Reservationists were permitted three (3) days paid sick leave and three (3) days paid personal leave annually.

56.     At or about July 2016, when Williams inquired about using her paid leave for days that she missed or might miss in the future due to her pregnancy and related medical issues, Red Top supervisors informed Williams that she had no paid leave.

57.     Williams was not permitted to use any paid leave during her employment at Red Top.

58.     Upon information and belief, all other Red Top employees were able to use their paid leave without issue.

59.     Upon information and belief, the motivating factor for abolishing Williams' paid leave was her pregnancy and her race.

60.     In July 2016, Williams was hospitalized for complications that arose from her pregnancy.

61.     In July 2016, while she was in the hospital, Williams' was informed that her schedule had been changed from 6:00am to 6:00pm, Sunday through Wednesday, to 6:00am to 2:00pm, Sunday through Friday.

62.     Williams inquired with her supervisors as to why her schedule was changed, but no reason or explanation was provided to her.

63.     Williams' schedule prior to July 2016 was steady and consistent. All other Red Top Reservationists also had steady and consistent schedules.

64.     As of July 2016, it was Red Top's policy and practice to provide advanced notice before changing an employee's schedule.

65.     Upon information and belief, no other Red Top Reservationists had their schedules changed without advanced notice.

66.     Upon information and belief, the motivating factor for changing Williams' schedule was her race and pregnancy, and doing so served no legitimate operational need of Red Top.

67.     Williams arranged to work her 6:00am to 6:00pm Sunday through Wednesday schedule with Red Top in order to allow her to have adequate childcare arrangements.

68.     The sudden change in schedule created childcare difficulties for Williams, who had to scramble to find childcare for Thursdays and Fridays.

69.     The sudden change in schedule created a financial hardship for Williams, who now had to pay for two (2) additional days of childcare each week.

70.     On July 27, 2016, after Williams' schedule was changed, Hodson met with Williams to discuss her subsequent absences. During this meeting Hodson threatened to terminate Williams' employment.

71.     Upon information and belief, Red Top changed Williams' schedule without advance notice in an attempt to create a pretextual reason to terminate her employment.

72.     During the July 27, 2016, meeting, Hodson told Williams that "you being pregnant doesn't mean anything around here."

73.     During the July 27, 2016, meeting, Hodson told Williams something to the effect of "if your pregnancy is so important to you, you should stay home and be a single mother."

74.     At the conclusion of the July 27, 2016, meeting, Hodson forced Williams to sign an agreement acknowledging that she had received a final warning of termination.

75.     Hodson informed Williams that if she did not sign the aforementioned agreement, she would be terminated effective immediately.

76.     The July 27, 2016, meeting was Williams' first warning.

77.     Upon information and belief, the July 27, 2016, meeting was an attempt to create a pretextual reason to terminate Williams' employment.

78.     The motivating factor for the aforementioned meeting and everything Hodson said and did during the meeting was Williams' race and her pregnancy.

79.     On August 15, 2016, Williams again experienced complications with her pregnancy, and was treated at the United Medical Center Emergency Department.

80.     Williams was told by her doctors that she should not return to work for at least three (3) days, and provided her with a note indicating this.

81.     When Williams returned to work three (3) days later, she provided the aforementioned note to her supervisors.

82.     On August 24, 2016, Williams was informed by Payton that, in addition to her regular duties, she would be responsible for data entry into the Red Top Computer system.

83.     Upon information and belief, no other Red Top Reservationists were given additional assignments such as Williams' data entry.

84.     Upon information and belief, the motivating factor for increasing Williams' workload was her race and her pregnancy.

85.     In September 2016, Williams again experienced complications with her pregnancy, and was admitted to the hospital on September 4, 2016.

86.     On September 6, 2016, Williams attempted to return to work, but was forced to leave early when she again began to experience complications with her pregnancy.

87.     Williams was told by her doctors to not return to work until September 10, 2016, and received a note indicating this.

88.     When Williams returned to work on September 10, 2016, she provided the aforementioned note from her doctor to her supervisors.

89.     On September 14, 2016, Williams again began to experience complications with her pregnancy and had to go to the Emergency Room.

90.     On September 14, 2016, Payton contacted Williams via telephone, informing her that she should not return to work and that her employment at Red Top had been terminated.

91.     After returning home, Williams requested a formal termination letter from Payton.

92.     Red Top refused to provide Williams with a termination letter.

93.     Williams applied for, and was granted, unemployment compensation from the Commonwealth of Virginia.

94.     Williams contacted Red Top each time she had to miss work due to health issues.

95.     Williams provided Red Top with documentation for each absence she had that was related to health issues.

96.     Red Top had no legitimate, nondiscriminatory reason to terminate Williams. The motivating factor for Red Top's termination of Williams was her race and her pregnancy.

97.     At Red Top, Caucasian employees were treated better than similarly situated non-Caucasian employees.

98.     During Williams tenure at Red Top, Claudia, a Hispanic employee, was terminated immediately after taking a week's leave due to a heart condition.

99.     Caucasian employees were not subject to disciplinary actions for health-related absences.

100.    In early 2016, Barbara, a Caucasian employee, was given one month's leave when she was bitten by a dog.

101.    Katherine, a Caucasian employee, would frequently leave early or take leave when she had minor health issues, such as a cold.

102.    On at least one occasion, Katherine was a "no call, no show" for her scheduled shift. When Katherine returned to work, her absence was excused when she told her supervisors that she had a cold.

103.    Red Top treated Williams less favorably than similarly situated non-pregnant and non-African-American employees.

104.     Upon information and belief, Murphy Brothers is involved in managing the day-to-day affairs of Red Top, including but not limited to, employee compensation decisions, employee discipline decisions, termination of employment decisions

105.     Upon information and belief, Murphy Brothers assisted in drafting the employee handbook for all Red Top employees.

106.     Upon information and belief, Murphy Brothers assisted in drafting all of Red Top's policies and procedures.

107.     Upon information and belief, Murphy Brothers was, at all times relevant herein, aware of Williams' pregnancy.

108.     Upon information and belief, Murphy Brothers was involved in all decisions related to Williams' employment at Red Top.

<u>**COUNT I**</u>
**Race and Sex Discrimination in Violation of Title VII of the Civil Rights Act of 1964, As Amended, 42 U.S.C. §2000(e)**
**Hostile Work Environment**

109.     The Plaintiff incorporates by reference paragraphs 1 through 109 as if fully set forth herein.

110.     Williams, as an African-American Female, is a member of a protected class.

111.     During Williams time of employment at Red Top, she was subjected to undue harassment. This undue harassment was due to her race and sex.

112.     Over a period of at least four (4) months, Williams was harassed for being pregnant by Red Top supervisors, including but not limited to, Hodson.

113.     Upon information and belief, Hodson has an animus towards women.

114.     Hodson and other supervisors berated Williams for being pregnant, for taking bathroom breaks and for missing days of work due to being hospitalized for her pregnancy.

115.    The aforementioned harassment was so severe and pervasive as to affect the conditions of Williams' employment and created an abusive working environment.

      a.   Williams' was denied paid leave and paid bathroom breaks.

      b.   Williams pay was decreased.

      c.   Williams' schedule was changed from four (4) days a week to six (6) days a week.

      d.   Williams' was given additional responsibilities.

      e.   Williams was denied FMLA leave.

      f.   Williams was ultimately terminated.

      g.   Williams was denied a formal termination letter.

116.    Supervisors with the power to remedy the aforementioned harassment had actual notice of this sexual and racial harassment, but chose to take no meaningful action to remedy the harassment, remaining deliberately indifferent.

117.    Red Top supervisors were the individuals who were perpetrating the racial and sexual harassment of Williams, and all of Williams' superiors were aware of the racial and sexual harassment perpetrated against Williams and other non-Caucasian women.

118.    As a result of the aforementioned sexual and racial harassment, Williams suffered damages, including but not limited to, emotional and psychological damages and distress, lost wages, lost income and employment opportunities, and other compensable injuries.

119.    Williams' employment was ultimately terminated by Red Top for no legitimate non-discriminatory reason. Any reason proffered by Red Top for Williams' termination is pretextual.

120.    In allowing the sexual and racial harassment described herein, the Defendants have acted

with malice and reckless indifference to Williams' rights pursuant to Title VII, causing Williams

to be harmed physically and economically.

121.    In allowing the sexual and racial harassment described herein, and remaining deliberately

indifferent to this harassment, the Defendants have displayed a reckless disregard for the Title VII

rights of all of the Defendants' employees.

122.    The Defendants' conduct described herein gives rise to punitive damages.

### COUNT II
**Race and Sex Discrimination in Violation of Title VII of the Civil Rights Act of 1964, As Amended, 42 U.S.C. §2000(e)**
**Disparate Treatment**

123.    Plaintiff incorporates by reference paragraphs 1 through 122 as if fully set forth herein.

124.    Williams, as an African-American Female, is a member of a protected class.

125.    Williams was treated less favorably than similarly situated Caucasian employees.

126.    Williams was treated less favorably than similarly situated and non-pregnant employees.

127.    Upon information and belief, Hodson has an animus towards women.

128.    Shortly after Hodson made disparaging remarks regarding Williams being pregnant, he

took adverse employment actions against Williams.

129.    Williams was denied paid time off, paid bathroom breaks, and FMLA leave, whereas

similarly situated Caucasian employees and non-pregnant employees were afforded these

employment benefits.

130.    Immediately after Williams was admitted to the hospital for complications related to her

pregnancy, her schedule was changed, requiring her to work six (6) days a week instead of four

(4) days a week.

131.    Williams' schedule was changed without any advance notice, whereas similarly situated Caucasian employees were allowed to choose their schedules, and were given advanced notice if their schedule changed for any reason.

132.    Shortly after Hodson made disparaging remarks regarding Williams being pregnant, her pay was decreased.

133.    Williams' pay was decreased without any proffered reason, whereas similarly situated Caucasian and non-pregnant employees did not have their pay decreased.

134.    Williams was forced to sign an agreement acknowledging that she had received a final warning of termination, despite the fact that she had received no prior warnings, and had done nothing other than take bathroom breaks and sick days, which were both a result of her pregnancy.

135.    Similarly situated Caucasian and non-pregnant employees were not required to sign agreements such as the one Williams was forced to sign.

136.    Williams was berated by her supervisors for missing work due to her pregnancy, despite the fact that she always provided notice and documentation from medical professionals, whereas similarly situated Caucasian and non-pregnant employees were able to miss months at a time, or be no call no shows, without any consequences.

137.    Williams' employment was ultimately terminated, whereas similarly situated Caucasian and non-pregnant employees were able to miss work with no disciplinary action taken against them.

138.    The motivating factor for this disparate treatment was Williams' race and sex.

139.    There was no legitimate, non-discriminatory reason for the disparate treatment of Williams. Any reason proffered by the Defendants is pretextual.

140.     Shortly after Williams inquired about maternity leave in the Summer of 2016, her employment was terminated.

141.     Upon information and belief, Williams' employment was terminated due to her being a pregnant African-American woman.

142.     The motivating factor for Williams termination was her being a pregnant African-American woman. There was no legitimate, non-discriminatory reason for the termination of Williams' employment. Any reason proffered by the Defendants is pretextual.

143.     In allowing the disparate treatment described herein, the Defendants have acted with malice and reckless indifference to Williams' rights pursuant to Title VII, causing Williams to be harmed physically and economically.

144.     In allowing the disparate treatment described herein, and remaining deliberately indifferent to this harassment, the Defendants have displayed a reckless disregard for the Title VII rights of all of the Defendants' employees.

145.     The Defendants' conduct described herein gives rise to punitive damages.

## COUNT III

**Interference with Plaintiff's Rights Pursuant to the Family and Medical Leave Act**

**("FMLA") 29 U.S.C. § 2614**

146.     Plaintiff incorporates by reference paragraphs 1 through 145 as if fully set forth herein.

147.     At the time Plaintiff inquired about FMLA in July 2016, Plaintiff had been working at Red Top since April 21, 2015, and had consistently worked 48 hours a week throughout her employment up to the time she inquired about FMLA leave.

148.     At the time Williams inquired about FMLA leave, she was an eligible employee under FMLA.

149.   Red Top is an employer under FMLA as they have well over fifty (50) employees who work twenty (20) or more calendar workweeks each year.

150.   Williams took no FMLA leave prior to her inquiry regarding FMLA leave.

151.   Due to her high risk pregnancy, and the complications associated with it, Williams was entitled to take FMLA leave during her pregnancy for hospitalization and treatment associated with her pregnancy.

152.   Williams was entitled to take FMLA leave to give birth and subsequently take care of her new baby.

153.   Williams inquiry to Payton, and her discussion with a Red Top Human Resources Division representative, provided notice of her intention to take FMLA leave.

154.   Red Top's statements that Williams was not eligible for FMLA leave and would be unable to take FMLA leave interfered with Williams' ability to take FMLA leave.

155.   The fact that Red Top took down all posting regarding FMLA leave the day after Williams inquired about FMLA leave demonstrates this interference was intentional.

156.   Red Top terminated Williams' employment within two (2) months of Williams' inquiry about FMLA leave.

157.   Red Top decreased Williams' pay shortly after she inquired about FMLA leave.

158.   The Defendants interference with Williams' FMLA rights caused her physical, emotional, psychological, and economic damages.

159.   Williams, and her unborn child, were put at-risk due to the Defendants' denial of FMLA leave.

## COUNT IV

### FMLA Retaliation Pursuant to 29 U.S.C. §2615

160.    Plaintiff incorporates by reference paragraphs 1 through 159 as if fully set forth herein.

161.    Williams engaged in a protected activity when she inquired about FMLA leave with her supervisor Payton and when she spoke with a Red Top Human Resources Division representative about FMLA leave.

162.    Red Top decreased Williams' pay, changed her schedule, denied her paid time off and terminated Williams' employment with two (2) months after Williams inquired about FMLA leave.

163.    There is a causal connection between Williams engaging in a protected activity and the aforementioned adverse employment actions.

164.    The Defendants retaliation against Williams for attempting to exercise her FMLA rights caused her physical, emotional, psychological, and economic damages.

165.    Williams, and her unborn child, were put at-risk due to the Defendants' retaliation against Williams for attempting to exercise her FMLA rights.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff Williams demands judgment against all Defendants as follows:

I.      Re-pleads and re-alleges paragraphs 1 through 165 with the same force and effect as if fully set forth herein;

II.     Subject to further discovery, reserves the right to amend the Complaint;

III.    An award of compensatory damages in favor of Williams for the Title VII violations;

IV.     An award of punitive damages in favor of Williams for the Title VII violations;

V.      An award of compensatory damages in favor of Williams for the FMLA violations;

VI.     Back pay and front pay;

VII.    Attorney's fees, costs and prejudgment interest;

VIII.   Any and all other relief that this Court deems just and fair.

Barbara Williams
By Counsel

Respectfully submitted,


_____
Billy L. Ponds
Counsel for the Plaintiff
The Ponds Law Firm
2101 L Street, NW
Suite 400
Washington, DC 22037
Telephone Number: (202) 333-2922
E-Mail: plfpc@aol.com

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA
CIVIL DIVISION**

| | |
|---|---|
| **BARBARA WILLIAMS** | : |
| | : |
| **Plaintiff** | : |
| | : |
| **v.** | : |
| | : |
| **MURPHY BROTHERS,** | : |
| **INCORPORATED** | : |
| | : |
| **and** | : |
| | : |
| **TRANSPORTATION INC.** | : |
| **d.b.a.  RED TOP CAB COMPANY** | : |
| **OF ARLINGTON** | : |
| | : |
| **Defendants** | : |

==============================

## <u>JURY DEMAND</u>

The plaintiff hereby requests a trial by jury of twelve (12) on all triable issues, including

the amount of damages to be awarded.

<div style="margin-left:50%">

Barbara Williams
By Counsel

Respectfully submitted,

<u>*/s/ Billy L. Ponds*</u>
Billy L. Ponds
Counsel for the Plaintiff
The Ponds Law Firm
2101 L Street, NW
Suite 400
Washington, DC 22037
Telephone Number: (202) 333-2922
E-Mail: plfpc@aol.com

</div>